[905 NYS2d 419]

In the Matter of STATE OF NEW YORK, Respondent, v STANLEY L. CAMPANY, an Inmate in the Custody of New York State Department of Correctional Services, Appellant.

Fourth Department, July 9, 2010

**APPEARANCES OF COUNSEL**

*Shirley A. Gorman*, Brockport, for appellant.

*Andrew M. Cuomo, Attorney General*, Albany (*Julie S. Mereson* of counsel), for respondent.

**OPINION OF THE COURT**

FAHEY, J.

## I

In this appeal from an order determining that he is a dangerous sex offender requiring confinement pursuant to Mental Hygiene Law article 10, respondent raises what is, in the context of this proceeding, the unique issue whether the order should be reversed because he was denied effective assistance of counsel. For the reasons that follow, we agree with respondent that he was entitled to effective assistance of counsel, but we reject his contention that he was denied meaningful representation. We therefore conclude that the order should be affirmed.

## II

Respondent is a repeat sex offender with a lengthy and active history of sexual crimes. In 1990, respondent was convicted upon his plea of guilty of sodomy in the first degree (Penal Law former § 130.50) for placing his mouth on the penis of a six-year-old boy. The presentence investigation with respect to that conviction included interviews of multiple children who had been in the company of respondent and revealed that respondent may have engaged in other inappropriate behaviors. Respondent suggested as much in a statement that he gave to the police in which he intimated that the sexual abuse to which he was subjected as a child was responsible for his sexual contact with the victim of the sodomy and what respondent character-

ized as "several either inappropriate or misunderstood situations with several other [boys]." Respondent was released to parole supervision in November 1993.

In August 1994, respondent's parole was revoked. The revocation concerned respondent's alleged acts of a sexual nature with clients of a nursing home at which respondent was employed. The violation release report indicated that respondent had been having anal intercourse each night with a male resident of the nursing home and that the subject resident lived at the home because he was incapable of caring for himself in the community. Respondent was again released to parole supervision in May 1995, and he was discharged therefrom upon his maximum expiration date in November 1995.

In April 1996, respondent was arrested and subsequently charged with 15 counts of sexual abuse in the first degree (Penal Law § 130.65 [3]), five counts of endangering the welfare of a child (Penal Law § 260.10 [1]) and one count of resisting arrest (Penal Law § 205.30). The indictment alleged that, in November and December 1995, respondent used his hand to rub and/or grab the penis of an eight-year-old boy; that, in March 1996, respondent rubbed his hand on the vagina of a four-year-old girl; and that, on two occasions in January 1996, respondent touched the penis of a 10-year-old boy. Respondent was subsequently convicted of five counts each of sexual abuse in the first degree and endangering the welfare of a child, and he was sentenced to a total of 12 years in prison. This time, respondent was not released to parole supervision.

In April 2008, as respondent neared the end of his sentence, petitioner filed a civil management petition pursuant to Mental Hygiene Law article 10. The petition was supported by the report of a licensed psychologist with the New York State Office of Mental Health, who determined that respondent suffered from nonexclusive pedophilia, i.e., respondent was sexually attracted to both males and females, as well as antisocial personality disorder. That psychologist also used two actuarial assessment tools to determine respondent's risk of reoffending: the "Static-99" tool, under which respondent scored in the high risk range that predicted a 44% rate of violent recidivism over five years and a 51% rate of recidivism over 10 years, and the "MnSOST-R" tool, which stated that respondent had a 57% risk of reoffending within a six-year period. The psychologist also noted that respondent had never completed a sex offender treatment program despite being offered such a program eight times.

Respondent's rationale for not completing a sex offender treatment program was that respondent would have to admit the past allegations against him, which he adamantly denied.

A probable cause order with respect to respondent was issued on April 16, 2008, and he was committed to a secure treatment facility during the pendency of this proceeding. The attorneys for the parties later stipulated that neither would observe any examination conducted by the other party's psychiatric examiner. On June 20, 2008, at respondent's request, Supreme Court issued an order for an "independent evaluation" of respondent, appointing respective psychiatric examiners for petitioner and respondent (*see* Mental Hygiene Law § 10.06 [d], [e]).

The matter proceeded to a trial on the issue whether respondent suffers from a mental abnormality (*see* Mental Hygiene Law § 10.03 [i]; § 10.07 [d]). The jury returned a verdict finding that respondent has a mental abnormality that predisposes him to commit further sex offenses and that respondent has serious difficulty in controlling such conduct. The court subsequently conducted a bench trial on the issue of respondent's dangerousness to determine whether to confine respondent or to place him on a regimen of strict and intensive supervision and treatment (*see* Mental Hygiene Law § 10.07 [f]; § 10.11). By order entered November 21, 2008, the court found that respondent has a mental abnormality with a strong predisposition to commit sex offenses, along with an inability to control his behavior, and that he is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility. The court thus concluded that respondent is a dangerous sex offender requiring confinement, and this appeal ensued.

### III

Respondent contends that he had a right to effective assistance of counsel and was denied that right based on the alleged shortcomings of his attorney under the federal and state standards for ineffective assistance of counsel in a criminal action (*see Strickland v Washington*, 466 US 668, 694, *reh denied* 467 US 1267 [1984]; *People v Baldi*, 54 NY2d 137, 147 [1981]). Our consideration of that contention necessarily requires that we determine the character of this proceeding, i.e., whether it is of a criminal or civil nature.

We start with the decisions of the United States Supreme Court in *Kansas v Hendricks* (521 US 346 [1997]) and *United States v Ward* (448 US 242, *reh denied* 448 US 916 [1980]). In

*Hendricks,* the Court upheld a statute specifically designed to accomplish the purposes of the civil confinement of sex offenders at the conclusion of their prison terms and concluded that such civil confinement was a civil rather than punitive restriction (521 US at 357-369). By that time, *Ward* had already established a two-part test to distinguish whether actions by the state are civil or criminal in nature:

> "First, we have set out to determine whether [the Legislature], in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other . . . Second, where [the Legislature] has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention . . . In regard to this latter inquiry, we have noted that 'only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground' " (448 US at 248-249).

The result in *Hendricks* was consistent with the Court's trend of upholding "involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards" (521 US at 357; *see Foucha v Louisiana,* 504 US 71, 80 [1992]; *Addington v Texas,* 441 US 418, 426-427 [1979]). Nevertheless, the plain language of the decisions in *Hendricks, Foucha* and *Addington,* read either individually or collectively, does not alone compel the conclusion that our decision in this case is to be premised on civil authority. Rather, those cases provide a framework by which to analyze the character of Mental Hygiene Law article 10. The following passage from *Hendricks,* which considers the nature of a Kansas civil commitment statute, is instructive:

> "The categorization of a particular proceeding as civil or criminal 'is first of all a question of statutory construction' . . . We must initially ascertain whether the legislature meant the statute to establish 'civil' proceedings. If so, we ordinarily defer to the legislature's stated intent. Here, Kansas' objective to create a civil proceeding is evidenced by its placement of the [Sexually Violent Predator] Act within the Kansas probate code, instead of the criminal code . . . , as well as its description of the Act as creating a *'civil commitment procedure*[ ]' . . .

Nothing on the face of the statute suggests that the legislature sought to create anything other than a civil commitment scheme designed to protect the public from harm.

"Although we recognize that a 'civil label is not always dispositive,' . . . we will reject the legislature's manifest intent only where a party challenging the statute provides 'the clearest proof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil[ ]' . . . In those limited circumstances, we will consider the statute to have established criminal proceedings for constitutional purposes" (521 US at 361).

Here, the legislative findings with respect to Mental Hygiene Law article 10 are embodied in Mental Hygiene Law § 10.01. Briefly, the Legislature found that, inter alia,

"[c]ivil and criminal processes have distinct but overlapping goals, and both should be part of an integrated approach" to the problem of sex offender recidivism (§ 10.01 [a]);

sex offenders with mental abnormalities predisposing them to engage in repeated sex offenses should receive treatment during incarceration "as a result of the criminal process, and [they] should continue to receive treatment when that incarceration comes to an end" (§ 10.01 [b]);

outpatient care is an appropriate means of treating some sex offenders, and "civil commitment should be only one element in a range of responses to the need for treatment" of those offenders (§ 10.01 [c]);

"some of the goals of civil commitment . . . are appropriate goals of the criminal process as well[and, f]or some recidivistic sex offenders, appropriate criminal sentences . . . may be the most appropriate way to achieve those goals" (§ 10.01 [d]);

"the system for responding to recidivistic sex offenders with civil measures must be designed for treatment and protection" (§ 10.01 [e]);

"the system should offer meaningful forms of treatment to sex offenders in all criminal and civil phases" (§ 10.01 [f]); and

the "civil commitment of sex offenders should be implemented in ways that do not endanger, stigmatize[ ] or divert needed treatment resources away from . . . traditional mental health patients" (§ 10.01 [g]).

All of those findings preceded the titling of Mental Hygiene Law article 10 as "Sex Offenders Requiring Civil Commitment or Supervision," and they are consistent with an intent to *treat* rather than *punish* offenders (*see Matter of State of New York v Farnsworth*, 75 AD3d 14 [2010]). A jury trial under article 10 does have some criminal characteristics—for example, the jury is to consist of 12 jurors (*see* Mental Hygiene Law § 10.07 [a]-[b]; CPL 270.05 [1]), and the verdict must be unanimous (*see* Mental Hygiene Law § 10.07 [d]). Nonetheless, the legislative intent embodied in Mental Hygiene Law § 10.01, coupled with the placement of the provisions of article 10 in the Mental Hygiene Law rather than the Penal Law, compels the conclusion that this statute is indeed of a civil nature (*see Hendricks*, 521 US at 361).

For those reasons, we conclude that this proceeding is of a civil rather than criminal nature and, in the context of civil litigation, a contention concerning ineffective assistance of counsel will not be considered absent "extraordinary circumstances" (*Lewis v Lewis*, 70 AD3d 1432, 1434 [2010]; *see Matter of Hares v Walker*, 8 AD3d 1019 [2004]). "Civil" as respondent's commitment may be, however, we are mindful of the fact that it is *indefinite* (*see* Mental Hygiene Law § 10.09 [b], [f]) and *involuntary*. Such confinement constitutes an "extraordinary circumstance."

Our conclusion is not without support by analogy. By way of example, a respondent in a proceeding concerning child custody, the termination of parental rights or the violation of a child support order is entitled to the effective assistance of counsel, and the applicable standard is the same as in a criminal proceeding (*see e.g. Matter of Kathleen K.*, 66 AD3d 683 [2009], *lv denied* 13 NY3d 713 [2009]; *Matter of Jenna KK.*, 50 AD3d 1216, 1217 [2008], *lv denied* 11 NY3d 703 [2008]; *Matter of Moore v Blank*, 8 AD3d 1090 [2004], *lv denied* 3 NY3d 606 [2004]; *Matter of Matthew C.*, 227 AD2d 679, 682 [1996]). That result is logical— the consequences of such proceedings are drastic, and a respondent in any such proceeding has the right to assistance of counsel that would be hollow unless that assistance is meaningful (*see Matthew C.*, 227 AD2d at 682). Likewise, the conse-

quences of an unfavorable determination at a Mental Hygiene Law article 10 proceeding are severe. Respondent's right to counsel would be eviscerated if counsel was ineffective (*see* Mental Hygiene Law § 10.06 [c]; § 10.08 [g]).

We now turn to the merits of respondent's instant contention. Inasmuch as respondent contends that he received ineffective assistance of counsel under both the state and federal standards, we use the state standard for ineffective assistance of counsel (*see People v Stultz*, 2 NY3d 277, 282 [2004], *rearg denied* 3 NY3d 702 [2004]; *People v Henry*, 95 NY2d 563, 565-566 [2000]; *cf. People v McDonald*, 1 NY3d 109, 114-115 [2003]; *see generally Baldi*, 54 NY2d at 147). Applying that standard, we conclude that there is no merit to the contention of respondent that he received ineffective assistance of counsel.

We reject the contention of respondent that his attorney was ineffective in stipulating with petitioner that neither he nor petitioner's attorney would observe an examination conducted by the psychiatric examiner for the other party. Respondent essentially contends that, because petitioner does not have the right to attend the examination by respondent's psychiatric examiner, respondent's attorney bargained away an opportunity to protect respondent for no return. Even assuming, arguendo, that a respondent's attorney has the right to attend a psychiatric examination conducted at petitioner's request in a proceeding pursuant to Mental Hygiene Law article 10 (*see* Mental Hygiene Law § 10.06 [d]; *Matter of State of New York v Carmelo M.*, 72 AD3d 1102 [2010]; *see also* CPL 250.10 [3]; *Matter of Lee v County Ct. of Erie County*, 27 NY2d 432, 444 [1971], *cert denied* 404 US 823 [1971]; *Ughetto v Acrish*, 130 AD2d 12, 21-25, *appeal dismissed* 70 NY2d 871 [1987], *lv denied* 70 NY2d 990 [1988]), respondent's contention lacks merit. The issue whether petitioner is permitted to attend the psychiatric examination of a respondent conducted on respondent's behalf in a proceeding of this nature (*see* Mental Hygiene Law § 10.06 [e]) was not resolved until after the subject stipulation was entered (*see generally Matter of State of New York v Bernard D.*, 61 AD3d 567 [2009]; *Matter of Charles S.*, 60 AD3d 954, 955 [2009]), and respondent's attorney was not required to anticipate a change in the law (*see generally People v Brisson*, 68 AD3d 1544, 1547 [2009], *lv denied* 14 NY3d 798 [2010]; *People v Lane*, 93 AD2d 92, 99 [1983], *lv denied* 59 NY2d 974 [1983]).

We also conclude that the contention of respondent that his attorney failed to investigate his case is based on matters

outside the record on appeal and thus is not properly before us (*see e.g. Matter of Gray v Kirkpatrick*, 59 AD3d 1092, 1093-1094 [2009]; *Matter of Prudential Prop. & Cas. Ins. Co. v Ambeau*, 19 AD3d 999 [2005]; *see also People v Boyde*, 71 AD3d 1442 [2010]). Moreover, "[t]here can be no denial of effective assistance of . . . . counsel arising from counsel's failure to 'make a motion or argument that has little or no chance of success' " (*People v Caban*, 5 NY3d 143, 152 [2005], quoting *People v Stultz*, 2 NY3d 277, 287 [2004], *rearg denied* 3 NY3d 702 [2004]), and the contention of respondent that his attorney was ineffective for failing to argue that the report of the psychiatric examiner appointed on his behalf should have remained private is thus without merit (*see* Mental Hygiene Law § 10.06 [e]). Contrary to the further contention of respondent, his attorney was not ineffective in using a peremptory challenge to exclude a prospective juror who had known respondent since childhood, rather than challenging him for cause. That prospective juror did not "cast serious doubt on [his] ability to render a fair verdict" (*People v Bludson*, 97 NY2d 644, 646 [2001]; *see* Mental Hygiene Law § 10.07 [b]; CPL 270.20 [1] [b]), and this is not a case in which the strategy of respondent's attorney "during jury selection fell below the requisite level of effective assistance" (*People v Turner*, 37 AD3d 874, 877 [2007], *lv denied* 8 NY3d 991 [2007]; *see generally People v Benevento*, 91 NY2d 708, 712-713 [1998]). Viewing the evidence, the law and the circumstances of this case as a whole and as of the time of the representation, we conclude that respondent received effective assistance of counsel (*see generally Baldi*, 54 NY2d at 147).

## IV

We next address respondent's remaining contentions. Respondent contends that the order should be reversed because of alleged evidentiary errors. Most of those errors are not preserved for our review (*see generally* CPLR 4017, 5501 [a] [3]), and we do not reach respondent's contention concerning them in the interest of justice (*see generally Huff v Rodriguez*, 64 AD3d 1221, 1223 [2009]). With respect to the contention of respondent that there was improper testimony that he threw knives at his father and that he was treated at the St. Lawrence Psychiatric Center, we note that, after his attorney objected to the questions eliciting that testimony, the attorney for petitioner either agreed to limit the scope of his questioning or to withdraw the question, and respondent's attorney did not seek further relief.

Consequently, we conclude that the alleged error was corrected to respondent's satisfaction, and any further contentions with respect to that issue are not preserved for our review (*see generally* CPLR 4017, 5501 [a] [3]). Respondent further contends that the court erred in permitting the psychiatric examiner for petitioner to testify concerning the use of a psychopathy checklist by the psychiatric examiner for respondent. Even assuming, arguendo, that the court so erred, we conclude that the error was harmless inasmuch as the psychiatric examiner for petitioner further testified that his informal scoring of the same test indicated that respondent had an increased risk of reoffending (*see generally* CPLR 2002; *Francis v Francis*, 262 AD2d 1065 [1999]).

Respondent's contention that neither of the subject psychiatric examiners should have been permitted to testify because neither established the reliability of the information contained in the records upon which they relied is not preserved for our review (*see generally Carr v Burnwell Gas of Newark, Inc.*, 23 AD3d 998 [2005]; *Balsz v A & T Bus Co.*, 252 AD2d 458 [1998]). In any event, that contention is based on matters outside the record on appeal and thus is not properly before us (*see generally Gray*, 59 AD3d at 1093-1094; *Prudential Prop. & Cas. Ins. Co.*, 19 AD3d at 1000). The further contention of respondent that he was denied due process with respect to securing a psychiatric examiner is also unpreserved for our review (*see Melahn v Hearn*, 60 NY2d 944, 945 [1983]), and we decline to review it in the interest of justice (*see generally Huff*, 64 AD3d at 1223).

We conclude that respondent failed to preserve for our review his contention that the court erred in admitting certain records of Central New York Psychiatric Center and the transcript of the trial that resulted in his 1996 conviction (*see generally* CPLR 4017, 5501 [a] [3]), as well as his further contention that the court erred in instructing the jury that the court would determine whether respondent required strict and intensive supervision and treatment or confinement if the jury found respondent to have a mental abnormality (*see* CPLR 4110-b; *De Long v County of Erie*, 60 NY2d 296, 306 [1983]; *Fitzpatrick & Weller, Inc. v Miller*, 21 AD3d 1374 [2005]). Respondent's contention that Mental Hygiene Law article 10 deprives a sex offender of equal protection is also not preserved for our review (*see generally Melahn*, 60 NY2d at 945), and we decline to review those contentions in the interest of justice (*see generally Huff*, 64 AD3d at 1223).

Accordingly, we conclude that the order should be affirmed.

MARTOCHE, J.P., CENTRA, PERADOTTO and PINE, JJ., concur.

It is hereby ordered that the order so appealed from is unanimously affirmed without costs.