# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

965.1
CA 15-00538
PRESENT: SMITH, J.P., CARNI, LINDLEY, VALENTINO, AND DEJOSEPH, JJ.

IN THE MATTER OF THE APPLICATION FOR DISCHARGE
OF MYRON WRIGHT, CONSECUTIVE NO. 16906 FROM
CENTRAL NEW YORK PSYCHIATRIC CENTER PURSUANT TO
MENTAL HYGIENE LAW § 10.09,
PETITIONER-RESPONDENT,

                              V                              MEMORANDUM AND ORDER

STATE OF NEW YORK, NEW YORK STATE OFFICE OF
MENTAL HEALTH, AND NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION,
RESPONDENTS-APPELLANTS.

ERIC T. SCHNEIDERMAN, ATTORNEY GENERAL, ALBANY (MICHAEL CONNOLLY OF
COUNSEL), FOR RESPONDENTS-APPELLANTS.

EMMETT J. CREAHAN, DIRECTOR, MENTAL HYGIENE LEGAL SERVICE, UTICA
(PATRICK T. CHAMBERLAIN OF COUNSEL), FOR PETITIONER-RESPONDENT.

-------------------------------------------------------------------------------------

Appeal from an order of the Supreme Court, Oneida County (Louis
P. Gigliotti, A.J.), entered March 26, 2015 in a proceeding pursuant
to Mental Hygiene Law article 10.  The order, among other things,
directed the discharge of petitioner from the custody of the Office of
Mental Health.

It is hereby ORDERED that the order so appealed from is reversed
on the law without costs, the motion is denied, and the matter is
remitted to Supreme Court, Oneida County, for further proceedings on
the petition in accordance with the following memorandum:  Petitioner
commenced this proceeding to challenge his continued confinement to a
secure facility as a dangerous sex offender.  Petitioner was convicted
of numerous sex offenses, including a 1972 rape that occurred hours
after he was placed on probation and a 1978 sex offense that occurred
shortly after his release from prison.  He was released again after
his ensuing prison sentence and, although he remained in the community
for approximately 10 years, he was sentenced to, inter alia, six years
in prison upon his 2001 plea of guilty to attempted rape in the first
degree (*see Matter of State of New York v Myron P.*, 86 AD3d 26, 28,
*affd* 20 NY3d 206).  After petitioner completed that prison term,
respondents commenced a proceeding seeking to confine him pursuant to
article 9 of the Mental Hygiene Law, and they then commenced an
article 10 civil confinement proceeding.  After a trial on the latter
proceeding, Supreme Court, Albany County (McNamara, J.), found that
petitioner was a dangerous sex offender in need of confinement and

committed him to a secure treatment facility (*see Myron P.*, 86 AD3d at 28).

In 2014, petitioner filed a petition pursuant to Mental Hygiene Law § 10.09 (f), seeking his release under a regimen of strict and intensive supervision and treatment. At the trial on the petition, respondents called Dr. Allison T. Prince, who opined that petitioner remained a dangerous sex offender requiring confinement. Dr. Prince based her opinion, inter alia, on her diagnosis that petitioner suffers from antisocial personality disorder, cannabis dependence in remission in a secure environment and paraphilia, otherwise specified, i.e., his arousal by and predisposition to engage in nonconsensual sex, in a highly formulaic and compulsive manner, following a well-defined cycle of offending. Dr. Prince testified regarding petitioner's history of offending, including his admission that he offended against 21 women, and his recent lack of progress in treatment. She also testified regarding the psychological tests given to petitioner, and developed a comprehensive profile of his sexual compulsions. Dr. Prince's evaluation of petitioner was also received in evidence.

At the conclusion of Dr. Prince's testimony, petitioner moved for a directed verdict pursuant to CPLR 4401, contending, inter alia, that respondents failed as a matter of law to meet their burden of establishing that he has serious difficulty controlling his conduct within the meaning of the Mental Hygiene Law. We agree with respondents that the court erred in granting the motion for a directed verdict. We therefore reverse the order, deny the motion and remit the matter to Supreme Court for further proceedings on the petition.

It is well settled that, "[i]n determining a motion for a directed verdict, the court must view the evidence in the light most favorable to the nonmoving party and resolve all issues of credibility in favor of the nonmoving party . . . , and may grant the motion only if there is no rational process by which the jury could find for the [nonmoving party] as against the moving" party (*Wolf v Persaud*, 130 AD3d 1523, 1524; *see generally State of New York v Farnsworth*, 107 AD3d 1444, 1445). In considering such a motion, "the trial court must afford the party opposing the motion every inference which may properly be drawn from the facts presented, and the facts must be considered in [the] light most favorable to the nonmovant" (*Szczerbiak v Pilat*, 90 NY2d 553, 556; *see Shelters v City of Dunkirk Hous. Auth.*, 126 AD3d 1329, 1329).

Pursuant to the Mental Hygiene Law, a person is classified as a dangerous sex offender requiring confinement if that person "suffer[s] from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility" (§ 10.03 [e]). The statute defines a mental abnormality as "a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex

offense and that results in that person having serious difficulty in controlling such conduct" (§ 10.03 [i]).

Here, the court concluded that, as a matter of law, respondents failed to establish that petitioner has serious difficulty in controlling his predisposition to commit sexual offenses. Respondents' burden with respect to that issue was to submit "clear and convincing evidence that [petitioner] had 'serious difficulty in controlling' his sexual misconduct within the meaning of section 10.03 (i)" (*Matter of State of New York v Donald DD.*, 24 NY3d 174, 187). Although we agree with petitioner that the evidence establishing that he was diagnosed with antisocial personality disorder and paraphilia is, standing alone, insufficient to meet that burden (*see id.* at 189-191), we conclude that the evidence presented by respondents in this case was sufficient to withstand petitioner's motion for a directed verdict.

Respondents introduced evidence that petitioner had been diagnosed with three mental disorders, i.e., antisocial personality disorder, paraphilia otherwise specified, and cannabis dependence in sustained remission in a controlled environment. We agree with the dissent that, when asked which factors led her to the conclusion that petitioner had serious difficulty in controlling his sexual behavior, Dr. Prince listed only certain factors. We note, however, that respondents elicited significant additional information concerning petitioner's predispositions from Dr. Prince throughout the trial, and she testified that such information factored into her diagnosis and her opinion that petitioner had the requisite serious difficulty in controlling his sexual conduct. That evidence therefore leaves an issue for the trier of fact whether petitioner has serious difficulty in controlling his predisposition to commit sexual crimes. First, respondents established that petitioner engaged in sexual offenses against 21 women but was not prosecuted for all of those offenses, and petitioner had "voiced having . . . sexual arousal to nonconsensual activity." Petitioner told Dr. Prince that there was a 50-50 chance that he would reoffend, thus lending credence to Dr. Prince's opinion that he had serious difficulty in controlling his conduct.

More importantly, however, Dr. Prince indicated that petitioner follows "a script of behaviors with his offense cycle . . . that he would play out with each offense," and she wrote in her report that petitioner "presents with a pattern of highly repetitive, compulsive sexual behavior." Dr. Prince testified that petitioner's cycle begins with feelings of loneliness, anger, powerlessness and isolation, which lead to the start of his cycle of offending. His cycle then progresses through fixating on a particular woman, stalking her, fantasizing about nonconsensual sex with her, planning on how to approach her, and then physically touching her and engaging in sex with her without her consent, often with the use of weapons.

Furthermore, Dr. Prince testified that petitioner never completed a sexual offender treatment program, became stagnant in his current treatment program, and slept during recent group treatment sessions. Dr. Prince testified that petitioner's treatment had not progressed to

the point where he had a viable plan for coping with that cycle, and that petitioner was isolating himself as a method of coping with the stresses that he faced from, inter alia, these Mental Hygiene Law article 10 proceedings.  She also opined that he needed to update his relapse prevention plan to account for his specific sexual offense cycle, but he had not done so.  Dr. Prince testified that petitioner has "been repeatedly really encouraged to focus more intently on areas related to his cycle, and he just hasn't done that."  In addition, although petitioner had previously submitted to two penile plethysmograph (PPG) tests earlier in the treatment process, they were inconclusive, and he refused to take a polygraph or another PPG test during his most recent phase of treatment.

Dr. Prince also relied on psychological testing of petitioner.  She noted that he had undergone Static-99 tests on several occasions, and that his test scores of 7 in 2007 and 2008 supported her conclusions.  In addition, she scored a VRS:SO test regarding petitioner, which indicated that he was in the high risk group for reoffending sexually.  Consequently, we conclude that Dr. Prince created "[a] detailed psychological portrait of a sex offender [that] allow[ed her] to determine the level of control the offender has over his sexual conduct" (*Donald DD*., 24 NY3d at 188).  Indeed, when the Court of Appeals was confronted with a trial of an offender with a similar diagnosis and supporting facts, the Court concluded that there was overwhelming evidence on the issue of the offender's inability to control his conduct (*see Matter of State of New York v Robert F.*, 25 NY3d 448, 454-455).

Dr. Prince also testified that petitioner indicated that he was becoming increasingly frustrated with the Mental Hygiene Law article 10 process, and his continued detention.  When coupled with the evidence of petitioner's clear, well-defined cycle of offending that begins with becoming frustrated, the deficits in his recent treatment plan on that specific area, and his stagnating course of treatment, we conclude that Dr. Prince's opinion and the supporting evidence, " 'when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, [establish that petitioner is a] . . . dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment[, rather than a] *dangerous but typical recidivist convicted in an ordinary criminal case*' " (*Donald DD.*, 24 NY3d at 189, quoting *Kansas v Crane*, 534 US 407, 413).  Thus, respondents submitted sufficient evidence that, if it is credited by the factfinder, would establish that petitioner has a condition, disease or disorder "that predisposes him . . . to the commission of conduct constituting a sex offense and that results in [petitioner] having serious difficulty in controlling such conduct" (§ 10.03 [i]; *see generally Matter of State of New York v John S.*, 23 NY3d 326, 348-349, *rearg denied* 24 NY3d 933).  Consequently, we conclude that, if the factfinder accepts that evidence, there is a "rational process by which the [factfinder] could find for [respondents] as against" petitioner (*Wolf*, 130 AD3d at 1524).

All concur except LINDLEY and DEJOSEPH, JJ., who dissent and vote to affirm in accordance with the following memorandum:  We respectfully dissent because we disagree with the conclusion of the majority, quoting *Matter of State of New York v Donald DD.* (24 NY3d 174, 188), that respondents' expert created " '[a] detailed psychological portrait of [petitioner that] allow[ed her] to determine the level of control the [petitioner] has over his sexual conduct.' " We therefore vote to affirm.

In 2014, the Court of Appeals wrote that sufficient evidence of a serious difficulty controlling sex-offending conduct may not consist of such "meager material" as that a sex offender did not make efforts to avoid arrest and re-incarceration, but instead must include a "detailed psychological portrait of a sex offender [to] allow an expert to determine the level of control the offender has over his sexual conduct" (*id.*).  Shortly thereafter, the First Department in *Matter of State of New York v Frank P.* (126 AD3d 150), relying on *Donald DD.*, held that the evidence on which the State experts relied was insufficient to establish by clear and convincing evidence that respondent has or will have serious difficulty controlling his behavior, where "respondent spent 33 consecutive years in prison and there is no evidence that he engaged in any inappropriate sexual behavior during that prolonged period to suggest that he had serious difficulty controlling his behavior in such an environment.  Instead, [respondent] voluntarily attended anger management and sex offender treatment programs while in prison" (*id.* at 163).

Here, during respondents' direct examination of their expert, Dr. Allison T. Prince, she was specifically asked to provide her opinion on why petitioner has serious difficulty controlling his behavior.  In response, she listed only four factors:  (1) the chronic nature of the offenses, including the fact that they started at a young age; (2) the fact that he offended despite the likelihood of being caught; (3) his previous criminal sanctions, including incarceration; and (4) his history of offending in a secure environment.

In our view, those factors are insufficient to establish by clear and convincing evidence "that [petitioner] had 'serious difficulty in controlling' his sexual misconduct within the meaning of section 10.03 (i)" (*Donald DD.*, 24 NY3d at 187).  With respect to the second and third factors, as we previously noted, the Court of Appeals made it clear that evidence of serious difficulty cannot consist of such "meager material" as a failure to make efforts to avoid arrest and re-incarceration (*id.* at 188).  As for the fourth factor, although there is some evidence that petitioner "sexually acted out" while imprisoned in the mid-1980's, the record is also clear that from 2000 to the present petitioner has not had any instances of sexual misconduct and has not engaged in any "proxy" behaviors - behaviors that mimic aspects of a person's sexual offenses - while in a secure facility. The events contemplated by the fourth factor occurred approximately 30 years ago, well prior to the offenses that led to petitioner's current confinement.  Those instances can hardly support the conclusion "that petitioner *currently* suffers from a 'mental abnormality' " (*Matter of Groves v State of New York*, 124 AD3d 1213, 1214 [emphasis added]).

As for the first factor, there is no dispute that petitioner has a lengthy criminal history of sex offenses dating back to the 1970's. These offenses, in Dr. Prince's view, followed a "script" or a pattern in which petitioner would form a relationship with a prostitute, stalk her, fantasize about the attack, plan the attack, and then complete the attack. Nevertheless, Dr. Prince did not provide a connection between the number of victims and the "serious difficulty" standard. In any event, while in *Donald DD.* there were certainly fewer victims and fewer crimes than here, in *Frank P.*, the respondent "was convicted of raping and sodomizing four women in their homes, and accused of raping seven more women" (*Frank P.*, 126 AD3d at 151). On those facts, the First Department, relying heavily on *Donald DD.*, determined that "the inferences that logically flow from [the] evidence [were] insufficient to support a determination, under the clear and convincing evidence standard, that respondent has or will have serious difficulty controlling his sexual behavior" (*id*. at 163). Simply put, as in *Frank P.*, it is impossible to conclude on this record whether the number of victims means that petitioner had "difficulty in controlling his urges or simply decided to gratify them" (*Donald DD.*, 24 NY3d at 188).

Although the majority is correct that respondents "elicited significant additional information concerning petitioner's predispositions from Dr. Prince throughout the trial," we disagree with the majority's view that Dr. Prince "testified that such information factored into her . . . opinion that petitioner had the requisite serious difficulty in controlling his sexual conduct." The issue of "serious difficulty" was not the only issue at the hearing and therefore not the only issue discussed by Dr. Prince; she provided testimony on the "mental abnormality" question along with testimony on the issue of whether petitioner is currently a dangerous sex offender requiring confinement. In our view, it is entirely speculative to conclude that the additional information provided by Dr. Prince was intended to address the serious difficulty question, and she simply failed to provide the connection suggested by the majority.

Finally, we note our disagreement with the majority's view of the record and the testimony of Dr. Prince that petitioner never completed a sex offender treatment program and has become stagnant in his current programs. Dr. Prince testified that one of petitioner's treatment providers told her that petitioner had " 'maxed out' of the treatment opportunities at the facility, because he . . . engaged in . . . mostly all of the groups that they offer." Moreover, the record is clear that petitioner is currently in phase III of his treatment and has been recommended for the final phase of treatment and apparently could proceed to phase IV if he took a third PPG test and a polygraph. In the four-phase treatment program provided by Office of Mental Health (OMH) secure facilities, "[p]hase III . . . requires participants to meet goals that demonstrate the ability to utilize skills and insights acquired earlier in the program. Upon completing these goals and maintaining them for six months or longer, participants may enter phase IV, which addresses individualized discharge planning for the transition back to the community. As of October 2011, approximately 270 residents of [OMH secure facilities]

were participating in the OMH program; fewer than 30 had reached phase III and only one . . . was in phase IV" (*Matter of Charles A. v State of New York*, 101 AD3d 1535, 1537).  In our view, petitioner's presence in phase III shows that he has made progress and has some level of understanding of his prior offenses and actions, and the so-called stagnancy of petitioner's treatment was not completely explained by Dr. Prince, who simply concluded that "[y]ou can still glean additional information from attending these [therapy] groups again."

Entered:  December 31, 2015                    Frances E. Cafarell
                                               Clerk of the Court